# UNITED STATES DISTRICT COURT
for the
District of Arizona
Phoenix Division

| | |
|---|---|
| KELLY VANESSA WOODS, individually and as Personal Representative of the Estate of Messiah Deasure-Shamyl McMillian, deceased,<br><br>*Plaintiff(s)*<br><br>-v-<br><br>CITY OF CHANDLER, a municipal corporation; CORT GRESSLEY, individually; NATHAN TOWNSEND, individually; OFFICER MEADE, individually; SERGEANT ROWTON, individually; and DOES I-X, individually,<br><br>*Defendant(s)* | Case No.: CV-26-04095-JJT<br><br>**FIRST AMENDED COMPLAINT**<br><br>Jury Trial: (check one)<br>☒ Yes ☐ No |

Plaintiff Kelly Vanessa Woods ("Plaintiff" or "Ms. Woods"), individually and as the duly appointed Personal Representative of the Estate of Messiah Deasure-Shamyl McMillian, deceased ("Messiah" or "Decedent"), by and through undersigned counsel, alleges as follows for her First Amended Complaint against Defendants City of Chandler, Cort Gressley, Nathan Townsend, Officer Meade, Sergeant Rowton, and Does I-X:

## I. NATURE OF THE ACTION

1. This civil rights and wrongful death action arises from the fatal shooting of Messiah Deasure-Shamyl McMillian, a twenty-seven-year-old young man with

schizophrenia, by a City of Chandler police officer during a known mental health crisis on March 20, 2025.

2. Before any officer arrived, Plaintiff told emergency dispatch that her son had schizophrenia, that he was in psychiatric crisis, and that an armed police response could escalate his condition. She asked for mental health assistance. The City instead dispatched armed patrol officers, among them Defendant Cort Gressley, an officer-in-training with approximately four months of service, riding with a field training officer who, by his own later account, treated the call as a "hands-off" evaluation of his trainee, without any behavioral health professional, crisis-intervention clinician, or crisis team support.

3. Approximately thirty seconds after officers arrived, and approximately fifteen seconds after Defendant Gressley first saw the knife, Defendant Gressley shot Messiah, firing four rounds. At the moment of the shooting, Messiah stood approximately seventeen feet away, holding a kitchen knife up at his own neck and chest. He was engaged in self-harm, and he had stabbed himself in the neck moments before the officers arrived. He was not within striking range of any officer, was not slashing, thrusting, or lunging at anyone, and no other person (i.e. no 3rd party) was within the knife's reach.

4. After Messiah was shot and he fell, Defendant Townsend radioed within eleven seconds that fire personnel should "stage," that is, wait outside the scene. For the next two minutes and forty-six seconds, no officer approached Messiah, rendered aid, or cleared the staged fire personnel to come in, while he lay face down and bled on the pavement. Officers instead shouted commands, performed a tactical magazine reload, drew tasers, retrieved and deployed a ballistic shield, pinned him, handcuffed him, and only then

called fire personnel in and began treatment, two minutes and fifty-seven seconds after the shots.

5. Messiah died of multiple gunshot wounds. The Maricopa County Office of the Medical Examiner determined the manner of death to be homicide, describing the death as caused by law enforcement gunfire.

6. Plaintiff brings the Estate's surviving claims as Personal Representative, her own claim for the deprivation of her relationship with her son under the Fourteenth Amendment, statutory claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act against the City, and state law claims for wrongful death and survival.

7. Plaintiff does not assert any claim against the City of Chandler under 42 U.S.C. § 1983 on a theory of respondeat superior. The City is sued under § 1983 solely for its own policies, customs, practices, deployment decisions, training and supervision failures, and deliberate indifference. The Chandler Police Department, a subdivision of the City previously named in the original Complaint, is not named as a defendant in this First Amended Complaint.

## II. JURISDICTION AND VENUE

8. This Court has original subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (a)(4), because those claims arise under the Fourth and Fourteenth Amendments to the United States Constitution, 42

U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as the federal claims.

10. This Court has jurisdiction over Plaintiff's claims for attorneys' fees and costs under 42 U.S.C. § 1988.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this District and a substantial part of the events giving rise to the claims occurred in Chandler, Maricopa County, Arizona. Assignment to the Phoenix Division is proper under LRCiv 77.1(a).

## III. PARTIES

12. Plaintiff Kelly Vanessa Woods is a resident of Maricopa County, Arizona, and is Messiah's mother. She brings this action individually, as a statutory beneficiary under A.R.S. § 12-612, and as the duly appointed Personal Representative of the Estate of Messiah Deasure-Shamyl McMillian.

13. On May 7, 2026, the Superior Court of Arizona in Maricopa County, Probate No. PB2025-006082, accepted Plaintiff's application for informal appointment and appointed Plaintiff Personal Representative of the Estate. Plaintiff brings the Estate's claims pursuant to A.R.S. § 14-3110 and Rule 17 of the Federal Rules of Civil Procedure.

14. Defendant City of Chandler (the "City") is a municipal corporation and political subdivision of the State of Arizona. The City operates the Chandler Police Department as a subdivision of the City, and acts through its final policymakers, officers, employees, and agents. The City is a public entity within the meaning of 42 U.S.C. § 12131(1) and receives federal financial assistance within the meaning of 29 U.S.C. § 794.

15. Defendant Cort Gressley, badge number 942, was at all relevant times a City of Chandler police officer-in-training in Phase 5 of the City's field training program, having graduated from the police academy in November 2024 with approximately four months of service at the time of the shooting. Before joining the Chandler Police Department, Defendant Gressley served approximately three years as a detention officer with the Maricopa County Sheriff's Office. Upon information and belief, he had no prior experience as a patrol officer. (Mesa PD Investigative Report, p. 20.) He fired the shots that killed Messiah. He acted under color of state law and within the course and scope of his employment. He is sued in his individual capacity.

16. Defendant Nathan Townsend, badge number 715, was at all relevant times a City of Chandler police officer and Defendant Gressley's assigned field training officer, with approximately ten years of service with the Chandler Police Department and ten years of prior service as a United States Army military police officer (Mesa PD Investigative Report, p. 25). He was present at the scene, drew his weapon, pulled the trigger twice, aiming first at Messiah's center mass and then at his head, and directed and participated in the response and in the post-shooting delay of medical care alleged below. His weapon did not discharge because the City had failed to maintain it in operable condition. He acted

under color of state law and within the course and scope of his employment. He is sued in his individual capacity.

17. Defendant Meade, Badge No. 714, was at all relevant times a City of Chandler police officer. Upon information and belief, his first name is Benjamin. He arrived at the scene approximately twenty-eight seconds after the shooting, drew a taser, retrieved the ballistic shield, and placed it on Messiah's back, and he participated in the post-shooting delay of medical care alleged below. (Mesa PD Investigative Report, pp. 18, 24, 32.) He acted under color of state law and within the course and scope of his employment. He is sued in his individual capacity.

18. Defendant Rowton, Badge No. S80, was at all relevant times a City of Chandler police sergeant and the ranking officer at the scene after the shooting. Upon information and belief, his first name is Peter. He arrived after Defendant Meade, participated in the decision to approach Messiah behind a ballistic shield rather than to render or permit immediate medical aid, advanced on Messiah with the shield group, and, as the on-scene supervisor, had authority to direct that the staged fire personnel be brought in. (Mesa PD Investigative Report, pp. 18, 24, 28.) He acted under color of state law and within the course and scope of his employment. He is sued in his individual capacity.

19. Defendants Does I-X are City of Chandler police officers, supervisors, dispatch personnel, or other employees whose identities are presently unknown to Plaintiff and who personally participated in the violations alleged herein, including: the officer or officers who participated in the decision to deploy an officer-in-training to a known mental health crisis without crisis-trained support; the dispatch and Real Time Operations Center

personnel who processed the calls and the deployment; any officer present at the scene, not otherwise named, who failed to summon or render timely medical aid; and any supervisor who directed or approved the response. Plaintiff will amend to identify each Doe defendant upon ascertaining his or her identity. Plaintiff attributes conduct to a Doe defendant only to the extent that defendant personally participated in the violation.

## IV. ADMINISTRATIVE PREREQUISITES, PROBATE HISTORY, AND TIMELINESS

20. On January 26, 2026, Plaintiff served a Notice of Claim pursuant to A.R.S. § 12-821.01 upon the City of Chandler, through its City Clerk, and upon the Chandler Police Department, through Chief of Police Brian Chapman, by certified mail, return receipt requested, article numbers 9589 0710 5270 1793 1028 24 and 9589 0710 5270 1183 0262 80. The Notice described the incident, the claims, and a specific settlement demand with supporting facts.

21. Plaintiff diligently pursued appointment as Personal Representative from shortly after her son's death. She filed an application for informal appointment in the Superior Court of Arizona, Maricopa County, on July 31, 2025, within five months of the death. The Probate Registrar denied that application on August 1, 2025, identifying documentary deficiencies.

22. Plaintiff thereafter continued to pursue appointment, including through a second application opened in error as Probate No. PB2026-001559 on February 27, 2026 and denied on March 11, 2026 because the original case remained open; correspondence

with the Probate Registrar through counsel in March 2026; and a corrected and notarized resubmission in April 2026 under the original case number, PB2025-006082.

23. The Probate Registrar accepted the corrected application and appointed Plaintiff Personal Representative on May 7, 2026. Plaintiff filed the original Complaint in this action thirty-four days later, on June 10, 2026.

24. The causes of action asserted on behalf of the Estate survived Messiah's death and may be asserted by the Estate's duly appointed personal representative, except as otherwise limited by law. A.R.S. § 14-3110. A person acquires the powers and undertakes the duties of a personal representative only upon appointment, qualification, and the issuance of letters, and administration of an estate commences upon the issuance of those letters. A.R.S. § 14-3103. Plaintiff was appointed Personal Representative of the Estate of Messiah Deasure-Shamyl McMillian on May 7, 2026, qualified for that appointment, and was issued letters of appointment, and administration of the Estate commenced upon their issuance. As Personal Representative, Plaintiff has the same standing to sue as Messiah had immediately before his death, A.R.S. § 14-3703(C), and is authorized to prosecute claims and proceedings in any jurisdiction for the protection of the Estate, A.R.S. § 14-3715(22). Before May 7, 2026, no person held those powers, and no person had legal capacity to assert the Estate's claims.

25. The Estate’s state law claims are timely. The applicable limitations period was suspended for four months following Messiah’s death pursuant to A.R.S. § 14-3802, and the original Complaint was filed within the period as so computed. In the alternative, the Estate’s claims did not accrue within the meaning of A.R.S. § 12-821.01(B) until a

personal representative existed with capacity to realize and act upon the Estate's damage. In the further alternative, the limitations period and the notice of claim period were equitably tolled during the time Plaintiff diligently but unsuccessfully sought appointment, because no personal representative existed with capacity to act for the Estate despite Plaintiff's continuous diligence.

26. No notice of claim is required for Plaintiff's federal claims.

## V. FACTUAL ALLEGATIONS

27. The facts alleged in this Part are drawn in part from the Mesa Police Department's investigative report, Report No. ME 2025-61190 (the "Mesa Report"), prepared by the Mesa Police Department Homicide Unit on behalf of the City under the East Valley Critical Incident Response Team protocol and obtained by Plaintiff through a public records request. Citations in the form "Mesa PD Investigative Report, p. __" are to the pages of that report as produced to Plaintiff. Plaintiff relies on the Mesa Report for the recorded times, measurements, statements, and laboratory findings it documents, and does not adopt its characterizations.

### A. The 911 Calls and the City's Advance Knowledge

28. On March 20, 2025, at approximately 12:14 p.m., the City received multiple 911 calls concerning Messiah's condition at his grandmother's residence, an apartment in the Hamilton Commons complex near Commonwealth Avenue and Hamilton Street in Chandler, Arizona. The callers included neighbors and family members. Plaintiff herself called and identified her son by name. (Mesa PD Investigative Report, pp. 17-18.)

29. Before officers arrived, Plaintiff informed emergency dispatch that Messiah suffered from schizophrenia and specifically warned that an armed police response could escalate his condition. Plaintiff requested mental health assistance rather than a conventional armed law enforcement response.

30. The City's dispatch system carried an advisory for the residence indicating multiple prior calls for service related to Messiah regarding mental health, and dispatch relayed that advisory to the responding officers. The call comments the officers received while en route stated that the subject was acting erratically and was believed to be having mental health issues. (Mesa PD Investigative Report, pp. 18, 21.) Chandler police records reflect thirteen recorded contacts with Messiah between February 2024 and March 2025, including three calls coded as "Mental Health Pick Up," one in February 2024 and two in May 2024, and a welfare check in February 2024. (Mesa PD Investigative Report, p. 35.) The responding officers knew, or through dispatch had reason to know, that the call involved a person in psychiatric crisis.

31. Neighbors who knew Messiah told investigators that he had on-and-off mental health issues, that he and his grandmother would argue, and that "the police would come to take Messiah away." The City therefore knew Messiah not as a stranger but as a person it had repeatedly encountered in psychiatric crisis. (Mesa PD Investigative Report, p. 45.)

B. The City's Deployment Decision

32. Despite its advance knowledge, the City dispatched multiple armed patrol officers with no behavioral health professional, no crisis-intervention clinician, and no member of any mental health crisis team.

33. Among the officers the City deployed was Defendant Gressley, an officer-in-training in Phase 5 of field training with approximately four months of service, operating under the supervision of Defendant Townsend as his field training officer. Defendant Townsend has since described his role on the call as "hands-off": he was evaluating whether Defendant Gressley could become a solo officer; the patrol vehicle's computer was oriented toward Defendant Gressley so that Defendant Townsend could not read the call comments; and, upon arrival, Defendant Townsend deliberately stopped himself from asking Messiah's grandmother what was happening because, as he later told investigators, he wanted Defendant Gressley to figure the situation out on his own. (Mesa PD Investigative Report, pp. 26-27.)

34. The City's Real Time Operations Center was monitoring the call while the officers were en route and messaged the patrol vehicle to correct the address. The City thus had personnel actively engaged with the call, in real time, before the officers arrived, and did not use that time to engage any crisis-trained resource. (Mesa PD Investigative Report, pp. 21, 26.)

35. Both Defendant Gressley and Defendant Townsend later stated to investigators that the situation developed too rapidly to request the City's Mental Health Crisis Team. The City's own deployment structure therefore ensured that no crisis-trained

resource was present or en route when officers made contact with a man the City knew to be in psychiatric crisis.

C. The Encounter

36. Defendants Gressley and Townsend arrived at approximately 12:21 p.m. in a marked patrol pickup truck and parked in the center driveway of the complex. Messiah was outside the residence, shirtless, wearing only shorts and socks, visibly distressed, and lying on the grass near the stairwell of the southern building.

37. Messiah was engaged in self-harm. In the minutes before the officers arrived, neighbors saw him stab himself in the neck with a small kitchen knife, fall to the ground, roll on the grass, and say things such as "not my life, not my life" and "I'm sorry, daddy." One neighbor saw him stab himself twice in the neck and fall hard to the ground. Another saw him stab himself "about four times." Messiah's grandmother had by then taken shelter in a neighbor's apartment, and the neighbor had locked the door. No other person was outside within the knife's reach when the officers arrived. (Mesa PD Investigative Report, pp. 16, 44, 47-48.)

38. At 12:22:05 p.m., Defendant Gressley stepped out of the truck. At 12:22:13 p.m., he called out, "sir, Chandler Police, how you doing." Messiah stood, mumbling, and ran away from the officers, southbound around the stairwell and out of view. At 12:22:19 p.m., Defendant Gressley radioed that Messiah was running away from him. (Mesa PD Investigative Report, p. 30.)

39. At 12:22:25 p.m., Messiah came back into view, running northbound through the courtyard with his right hand held up at his upper chest. At 12:22:27 p.m., Defendant

Gressley said aloud, "What are you holding," drew his handgun, and began stepping backward. At 12:22:29 p.m., he commanded, "Sir, drop it." Messiah turned and ran eastward toward the covered parking area, away from the officers, holding his right hand at his neck and counting aloud. A woman could be heard calling, "Messiah, Messiah." At 12:22:32 p.m., Defendant Townsend radioed, "He's got a knife to his neck." (Mesa PD Investigative Report, pp. 30-31, 33.)

40. At 12:22:34 p.m., Messiah turned and moved toward Defendant Gressley, still holding the knife up at his own neck and chest. Defendant Gressley backed away toward the patrol truck. Over the next eight seconds the officers shouted "drop it," "Sir, drop it," "Do not keep coming, stop," and "stop." No officer reached for any less-lethal option, and the investigating agency's body-worn camera summaries record no warning that deadly force would be used. Defendant Townsend drew his handgun at 12:22:35 p.m. and pointed it at Messiah. At 12:22:42 p.m., approximately thirty-seven seconds after leaving the truck and fifteen seconds after first seeing the knife, Defendant Gressley fired four rounds. Messiah fell face down on the asphalt with the knife still in his right hand. (Mesa PD Investigative Report, pp. 31, 33-34.)

41. By Defendant Gressley's own placement of the positions during his recorded walkthrough with investigators, he was approximately seventeen feet, four inches from Messiah when he fired the first shot. Defendant Townsend's placement put the distance between himself and Messiah at approximately sixteen feet, two inches. After firing he continued to back up, unimpeded, to the rear of the patrol truck. Retreat room and cover therefore remained available to him. (Mesa PD Investigative Report, pp. 37-38.)

42. At the moment Defendant Gressley fired, Messiah did not present an immediate threat of death or serious physical injury to Defendant Gressley or to any other person. Messiah held the knife at his own neck, not extended toward any officer. He had not closed to within striking range. He had not slashed, thrust, or lunged at anyone. He was a man in obvious psychiatric distress, moving erratically, who seconds earlier had run away from the officers, and the officers had distance, cover, and a patrol truck available to them. Defendant Gressley later told investigators that he fired because he "was worried he was going to stab me," that he "thought I was farther than this," and that he felt he "couldn't back up anymore," even though he in fact continued to back up after firing. (Mesa PD Investigative Report, p. 24.)

43. Defendant Gressley used no less-lethal tool before firing. He did not deploy the taser he carried. He did not use the patrol truck as a barrier. He did not slow the encounter or attempt any crisis communication beyond shouted commands. He later confirmed to investigators that he did not utilize any less-lethal tools during the incident. (Mesa PD Investigative Report, p. 22.)

44. Defendant Townsend also drew his handgun and twice pulled the trigger, aiming first at Messiah's center mass and then, after moving his optic upward, at Messiah's head. His weapon did not discharge. Defendant Townsend later told investigators that he consciously decided to pull the trigger, and at the scene he told Defendant Meade, "My gun wouldn't go dude, my gun wouldn't work." (Mesa PD Investigative Report, pp. 28, 35.) Subsequent forensic examination, reference FSS032025-0037-0003, determined that Defendant Townsend's City-issued handgun was inoperable in the condition received: the

slide could not be fully retracted, the trigger could not be fully pulled to the rear, and a thick, blue lubricant or grease had built up on the extractor, extractor depressor assembly, and firing pin safety so that those parts did not move freely. After the weapon was disassembled and cleaned, it functioned normally. The weapon had been rendered inoperable by lubricant buildup on its internal components, a condition resulting from improper maintenance. (Mesa PD Investigative Report, pp. 40, 99.)

45. At least one of the four rounds Defendant Gressley fired did not strike Messiah. It traveled beyond the scene into a neighboring apartment complex to the east, through the second-story bedroom window of a unit in which children were present, shattered the glass, gouged the drywall and window frame, and struck the bedroom door. Two projectiles were recovered from Messiah's body at autopsy. (Mesa PD Investigative Report, pp. 46, 64.)

D. The Delay in Medical Care

46. The following timeline is established second by second by the officers' body-worn camera recordings, as documented in the Mesa PD Investigative Report (pp. 30-35).

47. At 12:22:42 p.m., Defendant Gressley fired. Messiah fell to the ground, critically wounded and bleeding. At 12:22:44 p.m., the gunshots ceased. Messiah remained face down on the asphalt and continued to move.

48. At 12:22:45 p.m., Defendant Gressley radioed "shots fired." From 12:22:47 p.m., officers shouted commands at Messiah as he lay face down on the asphalt: "drop the knife, drop the knife," "drop the knife, do not move," and "sir, drop the knife so we can help you." No officer approached him or rendered aid.

49. At 12:22:53 p.m., Defendant Townsend radioed dispatch: "1P10, go ahead stage fire for us, subject is still holding the knife." Fire personnel were thus summoned to stage, meaning to wait outside the scene, eleven seconds after the shooting. No officer cleared them to enter for another two minutes and forty-six seconds. (Mesa PD Investigative Report, p. 34.)

50. At 12:23:10 p.m., Defendant Meade arrived. At 12:23:27 p.m., Defendants Gressley and Meade moved to Defendant Townsend's position at the front passenger corner of the patrol truck. Defendant Townsend directed Defendant Gressley to perform a "tac reload" of his handgun, which Defendant Gressley did. Defendant Meade drew his taser. Defendant Rowton, the sergeant, arrived during this period. (Mesa PD Investigative Report, pp. 24, 28, 32.)

51. At 12:24:10 p.m., approximately one minute and twenty-eight seconds after the shooting, Defendant Meade left to retrieve a ballistic shield rather than render aid. Defendant Gressley holstered his handgun and drew his taser. Defendant Townsend remained in what he called "lethal coverage," pointing at Messiah a handgun he already knew did not work. (Mesa PD Investigative Report, pp. 28, 32.)

52. At 12:24:42 p.m., officers called to Messiah: "hey what's your name bud, we want to help you, we need to get you medical attention, we need you to drop the knife." Messiah, shot at four times, and hit at least twice, was face down and did not respond. Defendants Gressley, Townsend, Meade, and Rowton then decided to use the shield, as Defendant Gressley later put it to investigators, so that they could move up to Messiah and

render medical aid to him. Two minutes had by then passed since the shooting. (Mesa PD Investigative Report, pp. 24, 32.)

53. At 12:25:10 p.m., Defendants Gressley, Townsend, and Meade, joined by Defendant Rowton, approached Messiah behind the ballistic shield, pinned him to the ground with it, placed the shield on his back, removed the knife from his hand, and handcuffed him.

54. At 12:25:39 p.m., officers asked for the fire department to come in and began assessing Messiah and providing medical aid. Two minutes and fifty-seven seconds elapsed between the shots and the first medical assistance, while Messiah lay shot, bleeding, and dying on the pavement. Officers applied a chest seal to a gunshot wound at Messiah's sternum at approximately 12:25:55 p.m. Messiah remained handcuffed until 12:27:25 p.m. Chest compressions did not begin until 12:28:14 p.m., approximately five minutes and thirty-two seconds after the shooting. (Mesa PD Investigative Report, p. 32.)

55. Each of Defendants Gressley, Townsend, Meade, and Rowton knew Messiah had been shot, knew he was bleeding from gunshot wounds, knew that fire personnel had been staged and were waiting, and knew he had an obvious, life-threatening medical need. Each nevertheless delayed and failed to promptly bring in, provide, or facilitate emergency medical care.

56. Witness video depicts Messiah bleeding extensively while confused and nonresponsive and depicts officers administering CPR only after he became nonresponsive, with no emergency medical personnel visible. A neighbor who watched from her doorway saw the officers retrieve the shield, handcuff Messiah, realize "he was

gone," uncuff him, turn him over, and only then begin CPR. (Mesa PD Investigative Report, p. 45.)

57. The delay in medical care caused Messiah additional conscious pain and suffering and contributed to his death.

E. Cause and Manner of Death

58. Messiah was transported by Tempe Fire Department personnel to Chandler Regional Medical Center, where he was pronounced dead at 12:58 p.m., approximately thirty-six minutes after the shooting. The Maricopa County Office of the Medical Examiner, case number 25-03401, performed an autopsy on March 22, 2025 and issued a final report on May 21, 2025, determining the cause of death to be multiple gunshot wounds and the manner of death to be homicide, described as shot by law enforcement. (Mesa PD Investigative Report, pp. 18, 42, 51.)

F. Witness Accounts and the Investigative Record

59. Civilian witness accounts contained in the Mesa PD Investigative Report describe a man in obvious psychological distress harming himself, not a man attacking others. Witness Miranda Paskitti stated that the situation "went down very quickly," that she had heard Messiah "had been hurting himself and threatening to hurt himself," and that after the officers fired, Messiah was "wailing." She told investigators that "three shots for a man who was maybe twenty feet away with a knife" might have been excessive, that the incident was "very abrupt and very quick," and that "police situations of this nature needed to be handled in a different manner." Witness Quiana Killian described Messiah holding a

"little kitchen knife" and stated that "he just started stabbing himself, like in his, in the neck." Witness Jana Pennington, who saw Messiah moving toward the officers in the seconds before the shots, saw his hands held close to his chest near his neck and "did not see anything in Messiah's hands." Witness Jessica Paulson likewise saw no knife in his hand and saw a knife only on the ground after the shooting. Witness Nazary Lopez heard commands of "drop it, drop it" followed by four gunshots. Witness Bobbi Barnett, who saw Messiah stab himself in the neck by the stairs shortly before the shooting and saw an officer near the carport watch him fall, described him as "out of it." (Mesa PD Investigative Report, pp. 13-14, 16, 44-45, 47-48.)

60. The Mesa Report's briefing narrative, prepared by Detective M. Benzon on March 26, 2025 (Mesa PD Investigative Report, p. 15), states that Messiah was "threatening himself and others with a knife." Whatever had passed between Messiah and his grandmother earlier that morning inside the apartment, by the time the officers arrived she was inside a neighbor's locked apartment, no other person was within reach of the knife, and every civilian who saw Messiah with the knife saw it turned on himself. The characterization of Messiah as a threat to others at the time of the shooting is materially inconsistent with the civilian witness statements in the same records, which describe self-harm and psychological distress, not threats directed at officers or others.

61. The Maricopa County Attorney's Office advised the investigating agency on September 2, 2025 that Defendant Gressley "did not commit any act that warrants criminal prosecution," and no criminal charges will be brought against Defendant Gressley. No

criminal proceeding is pending. The absence of criminal charges is not a determination of civil liability. (Mesa PD Investigative Report, p. 50.)

G. The City's Own Conduct

62. The City knew before March 20, 2025 that its officers regularly encounter persons experiencing psychiatric crises. Its dispatch system maintained mental health advisories, including the advisory concerning Messiah, its officers had recorded thirteen contacts with Messiah in the preceding thirteen months, including three mental health pickups, and the City had created a Mental Health Crisis Team precisely because such encounters recur.

63. Notwithstanding that knowledge, the City deployed to a flagged psychiatric crisis an officer-in-training with approximately four months of service, under a field training officer who treated the call as a "hands-off" evaluation of his trainee; provided no crisis-trained personnel; equipped the supervising field training officer with a weapon the City had failed to maintain in operable condition; and structured its response so that, in the officers' own words, events outpaced any request for the Crisis Team.

64. Upon information and belief, the City provided no training, or no more than nominal training, to Defendants Gressley, Townsend, Meade, and Rowton and its patrol officers on: distinguishing a person engaged in self-harm from a person presenting an immediate threat to others; the use of time, distance, cover, and containment in place of confrontation when responding to a person known to be in a mental health crisis and appearing to harm only himself; and immediate hemorrhage control and post-shooting medical response.

65. Upon information and belief, the incident of March 20, 2025 was not the first time the City has met a person in crisis with an armed patrol response that ended in an officer-involved shooting. The City publishes on its police department website a list of officer-involved shooting incidents from 2021 forward. Among those incidents, on July 17, 2022, City officers fatally shot a person following a prolonged standoff and the use of less-lethal rounds; the officers who fired included a patrol officer with approximately one year of service. Plaintiff will amend to identify additional incidents as the City's records are obtained.

66. Upon information and belief, the City has established a Behavioral Health Unit within its police department, staffed with personnel trained to respond to persons in mental health crisis, in recognition of the recurrence of such encounters. The City did not deploy, engage, or consult that unit before or during its response to Messiah.

## VI. CAPACITY AND STANDING

67. The Estate's claims under § 1983 for violation of Messiah's Fourth and Fourteenth Amendment rights are brought solely by Plaintiff in her capacity as Personal Representative on behalf of the Estate, pursuant to A.R.S. § 14-3110. Plaintiff does not assert Messiah's personal constitutional claims in her individual capacity.

68. Plaintiff's claim for deprivation of familial association under the Fourteenth Amendment is brought by Plaintiff in her individual capacity, for the loss of her own constitutionally protected relationship with her son.

69. Plaintiff's state law wrongful death claims are brought by Plaintiff in her individual capacity as surviving parent and statutory beneficiary pursuant to A.R.S. §§ 12-611 and 12-612. The Estate's state law survival claim is brought by Plaintiff as Personal Representative.

**COUNT ONE - 42 U.S.C. § 1983: EXCESSIVE FORCE, FOURTH AMENDMENT**

**(By the Estate, Against Defendant Gressley)**

70. Plaintiff incorporates all preceding paragraphs.

71. Defendant Gressley seized Messiah within the meaning of the Fourth Amendment when he shot him.

72. The use of deadly force was objectively unreasonable under the totality of the circumstances. At the moment Defendant Gressley fired: Messiah was a visibly distressed man in a known psychiatric crisis, and that crisis had been communicated to the officers at the scene; the officers had been warned in advance of his schizophrenia; he held a kitchen knife at his own neck and chest; the domestic disturbance for which the officers had been dispatched was over, and Messiah's grandmother was safe inside a neighbor's locked apartment; he was not fleeing; he was approximately seventeen feet from Defendant Gressley; he was not within striking range of, and had not slashed, thrust, or lunged at, any officer or third party; the body-worn camera record reflects no warning that deadly force would be used, and any warning given afforded no meaningful opportunity to comply; and time, distance, cover, containment, communication, and less-lethal alternatives were reasonably available and were not used.

73. The right of a person in mental health crisis, who holds a weapon at his own body and is not attacking or within striking range of others, to be free from deadly force was clearly established before March 20, 2025. A reasonable officer in Defendant Gressley's position would have known that shooting Messiah under these circumstances violated the Fourth Amendment.

74. As a direct and proximate result, Messiah suffered multiple gunshot wounds, including wounds to the chest and shoulder, conscious pre-death physical and emotional pain and suffering, the additional pain and suffering caused by the delay of medical aid, the loss of his life, and death, and the Estate sustained economic damages including funeral and burial expenses and the loss of the value of Messiah's life and earnings.

75. Defendant Gressley's conduct was, at a minimum, negligent, and was reckless and demonstrated callous indifference to Messiah's federally protected rights, entitling the Estate to punitive damages against him in his individual capacity.

**COUNT TWO - 42 U.S.C. § 1983: DENIAL OF OBJECTIVELY REASONABLE MEDICAL CARE, FOURTH AMENDMENT; IN THE ALTERNATIVE, FOURTEENTH AMENDMENT**

**(By the Estate, Against Defendants Gressley, Townsend, Meade, Rowton, and Participating Doe Defendants)**

76. Plaintiff incorporates all preceding paragraphs.

77. After Messiah was shot, he was seized, incapacitated, face down, and bleeding out from multiple gunshot wounds. His need for immediate medical care was

imperative, and it was apparent to every officer present. At least four City officers were present at the scene before fire personnel were permitted to enter: Defendants Gressley, Townsend, Meade, and Rowton.

78. Defendants Gressley, Townsend, Meade, and Rowton, and the participating Doe Defendants, each had the ability and the duty to promptly summon, provide, or facilitate emergency medical care. For two minutes and fifty-seven seconds, none did. Instead, the officers held fire personnel outside the scene after staging them at 12:22:53 p.m.; shouted commands at a man who was face down, shot four times, and not responding; performed a tactical magazine reload; drew tasers; retrieved a ballistic shield; approached Messiah behind that shield; pinned him with it; removed the knife; and handcuffed him. Only at 12:25:39 p.m. did they call fire personnel in and begin to assess him. A chest seal was applied at approximately 12:25:55 p.m. Messiah remained handcuffed until 12:27:25 p.m., and chest compressions did not begin until 12:28:14 p.m. Fire personnel then took over and transported Messiah to the hospital, where he was pronounced dead at 12:58 p.m.

79. The failure to promptly summon or render medical care to a young man the officers had just shot, who lay bleeding and nonresponsive before them, was objectively unreasonable under the totality of the circumstances and violated Messiah's rights under the Fourth Amendment. In the alternative, if the Court determines the post-shooting period is not governed by the Fourth Amendment, the same conduct violated Messiah's rights under the Due Process Clause of the Fourteenth Amendment, because the officers' own affirmative conduct caused his medical need and they then delayed and denied the care that need obviously required.

80. Each individual Defendant is liable under this Count only to the extent he personally knew of Messiah's condition and personally participated in, directed, or caused the delay or denial of care.

81. The delay caused Messiah additional conscious pain and suffering and contributed to his painful and untimely death. The individual Defendants' conduct was reckless and callously indifferent to Messiah's rights, entitling the Estate to punitive damages against them in their individual capacities.

## COUNT THREE - 42 U.S.C. § 1983: DEPRIVATION OF FAMILIAL ASSOCIATION, FOURTEENTH AMENDMENT

**(By Plaintiff Individually, Against Defendants Gressley, Townsend, Meade, Rowton, and All Participating Doe Defendants)**

82. Plaintiff incorporates all preceding paragraphs.

83. Plaintiff possessed a liberty interest, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, in the companionship and society of her son.

84. The circumstances afforded the officers the opportunity for actual deliberation. The officers received the dispatch information identifying a psychiatric crisis before they arrived and had time to plan their approach; upon arrival they faced a man engaged in self-harm who was attacking no one, at a distance, with no third party at risk; and they possessed time, distance, cover, and containment options. With deliberation practical, the officers' escalation of the encounter and use of deadly force against a self-

harming man in psychiatric crisis, followed by the delay of medical care to him as he bled, constituted deliberate indifference to Plaintiff's protected relationship with her son and shocks the conscience.

85. In the alternative, if the Court determines that the encounter did not permit actual deliberation, the conduct alleged, including the choice to confront and shoot a self-directed, non-threatening man in a mental health crisis of which the officers had been informed, within approximately thirty seconds of arrival and the withholding of aid thereafter for two minutes and fifty-seven seconds, supports the inference that force was used with a purpose to harm unrelated to any legitimate law enforcement objective, because no arrest, self-defense, or defense-of-others purpose was objectively served by shooting a man who appeared to be threatening only himself.

86. As a direct and proximate result of these acts and omissions, Plaintiff suffered the loss of the companionship, society, love, support, and guidance of her son, together with severe emotional distress, grief, and mental anguish arising from the untimely and brutal death of her young son.

**<u>COUNT FOUR - 42 U.S.C. § 1983: MUNICIPAL LIABILITY</u>**

**(By the Estate and Plaintiff Individually, Against Defendant City of Chandler)**

87. Plaintiff incorporates all preceding paragraphs.

88. The constitutional violations alleged in Counts One through Three were caused by the City's own policies, customs, practices, and deliberate choices, including its acts and omissions, each of which was a moving force behind the violations.

89. Deployment practice. The City maintained an affirmative practice of dispatching armed patrol officers, including officers-in-training under field supervision, as the sole response to calls the City itself had flagged as involving persons in mental health crisis, without crisis-trained personnel, behavioral health support, or any structural mechanism ensuring that its Mental Health Crisis Team could be engaged before officers confronted the person in crisis. That practice led to the placement of a four-month trainee in front of Messiah within thirty seconds of arrival with no crisis resource available. The practice was a deliberate choice among alternatives, was known to City policymakers through the City's own dispatch advisories and prior mental health calls for service, and made the violation of the constitutional rights of persons in psychiatric crisis a highly predictable consequence.

90. Failure to train. Upon information and belief, the City failed to provide its patrol officers, including Defendants Gressley, Townsend, Meade, and Rowton, any training, or more than nominal training, in: distinguishing self-harm from an immediate threat to others; the use of time, distance, cover, and containment in psychiatric crisis encounters involving individuals known to be in a mental health crisis and appearing to harm only themselves; and immediate post-shooting hemorrhage control and medical response. The need for such training was patently obvious given the recurrence of psychiatric crisis calls the City itself tracked, and the absence of such training made constitutional violations a highly predictable consequence.

91. Failure to supervise and equip. The City assigned a Phase 5 officer-in-training, that is, a trainee in the final evaluation phase of field training, to respond to a

flagged psychiatric crisis under the supervision of a field training officer who treated the call as a "hands-off" evaluation and whose City-issued weapon the City had failed to maintain in operable condition, as confirmed by forensic examination FSS032025-0037-0003 (Mesa PD Investigative Report, pp. 40, 97-100). The City's supervision and equipment maintenance failures deprived the response of the supervisory safeguard the City's own field training structure presupposes.

92. The City's decision to place Defendant Gressley, a trainee, at the helm of this crisis, with his field training officer standing back to evaluate him, was itself an affirmative practice and a deliberate choice.

93. Pattern and notice. The City was on notice, before March 20, 2025, that its armed patrol response to persons in crisis produced officer-involved shootings, including the July 17, 2022 incident alleged above. It was on notice, through thirteen recorded contacts including three mental health pickups, that Messiah in particular was a person in recurring psychiatric crisis. Notwithstanding the existence of its Behavioral Health Unit, the City had no policy or practice requiring that unit to be engaged before armed patrol officers confronted a person the City had already flagged as being in crisis. In the alternative, the need for the training and deployment practices identified above was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City's failure constitutes deliberate indifference without regard to any prior pattern.

94. Each of the foregoing policies, practices, and failures reflected deliberate indifference to the rights of persons in mental health crisis with whom City officers regularly come into contact, and each was closely related to and a moving force behind

Messiah's death and the deprivation of Plaintiff's familial relationship. Had the City deployed a crisis-trained resource, trained its officers in the identified respects, or supervised and equipped the response competently, Messiah's constitutional injuries would not have occurred.

**COUNT FIVE - DISABILITY DISCRIMINATION UNDER FEDERAL LAW: TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132, AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794**

**(By the Estate, Against Defendant City of Chandler)**

95. Plaintiff incorporates all preceding paragraphs.

96. Messiah was a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2), that is, an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, met the essential eligibility requirements for receipt of the City's services, including its police and emergency response services, which the City provides to all members of the public. His schizophrenia was a mental impairment substantially limiting one or more major life activities, 42 U.S.C. § 12102(1)(A) and (2)(A), including thinking, communicating, and caring for himself.

97. The City's police response to persons in crisis is a service, program, or activity of a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131(1) and 12132. The City receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and (b).

98. The City knew of Messiah's disability before its officers arrived: the City's dispatch was expressly informed of it by Plaintiff, and dispatch in turn expressly informed the responding officers of the mental health advisory attached to the residence. Plaintiff told dispatch of his schizophrenia and asked for a mental health response; the City's dispatch system carried an advisory reflecting his prior mental health contacts; and his condition was obvious at the scene.

99. Reasonable accommodations existed and were feasible, including: dispatching or engaging the City's Mental Health Crisis Team or other crisis-trained personnel; structuring the response around containment, distance, cover, and time; employing non-threatening crisis communication rather than shouted commands; and delaying confrontation where, as here, the person in crisis threatened no one but himself, was acting non-aggressively toward others, appeared confused, and held the knife to his own body. The City provided none of these accommodations at the deployment stage or at the scene.

100. By reason of his disability, Messiah was denied the benefits of the City's services and was subjected to discrimination: the City met a medical and psychiatric emergency with an armed confrontation it knew could escalate precisely because of his disability, and he suffered greater injury and indignity in the encounter than a person not in psychiatric crisis would have suffered.

101. The City acted with deliberate indifference. It had actual knowledge, through dispatch, its own advisory, and Plaintiff's warnings, that harm to Messiah's federally

protected rights was substantially likely absent accommodation, and it failed to act on that likelihood.

102. As a direct and proximate result, Messiah suffered injury and death, and the Estate sustained the damages alleged herein.

**COUNT SIX - NEGLIGENCE RESULTING IN WRONGFUL DEATH, A.R.S. §§ 12-611 AND 12-612**

**(By Plaintiff Individually as Statutory Beneficiary, Against All Defendants)**

103. Plaintiff incorporates all preceding paragraphs.

104. This Count asserts, through Arizona's wrongful death statutes, the negligence claims Messiah could have maintained had he lived. Defendants owed Messiah a duty of reasonable care, including the duty to respond with reasonable tactics to a known psychiatric emergency, to refrain from unreasonable escalation, to use reasonable care in the deployment, supervision, and equipping of officers, and to render or summon timely medical aid to a person they had shot.

105. Defendants breached those duties as alleged above: the City through its deployment, training, supervision, and equipment failures; Defendant Gressley through his unreasonable escalation and use of deadly force against a self-harming man who threatened no one else; Defendant Townsend through his failures of supervision at the scene and his participation in the delay of medical care; Defendants Meade and Rowton through their participation in the decision to hold fire personnel outside the scene and to withhold

medical care while a ballistic shield was retrieved and deployed; and the participating Doe Defendants through their respective conduct.

106. Defendants' breaches directly and proximately caused Messiah's death. His death was unnecessary and preventable.

107. As a direct and proximate result, Plaintiff, as surviving parent and statutory beneficiary under A.R.S. § 12-612, suffered the loss of her son's companionship, love, care, guidance, and society, severe emotional distress, grief, and mental anguish, and has incurred funeral, burial, and related expenses.

108. To the extent this Count is subject to A.R.S. §§ 12-821 and 12-821.01, Plaintiff pleads the timeliness allegations of Part IV, including equitable tolling. The City suffered no prejudice: it had immediate and complete knowledge of the incident, which its own police department investigated from the day of the shooting.

**COUNT SEVEN - NEGLIGENT HIRING, TRAINING, SUPERVISION, RETENTION, AND DEPLOYMENT, RESULTING IN WRONGFUL DEATH**

(By Plaintiff Individually as Statutory Beneficiary, Against Defendant City of Chandler)

109. Plaintiff incorporates all preceding paragraphs.

110. The City owed Messiah and the public a duty of reasonable care in hiring, training, supervising, retaining, deploying, and equipping police officers entrusted with deadly force, including the duty to adopt and enforce reasonable practices for responses to persons in known psychiatric crisis.

111. The City breached that duty by deploying an officer-in-training with approximately four months of service to a flagged psychiatric crisis without crisis-trained support and under a field training officer who treated the call as a "hands-off" evaluation; by failing to train its officers in the respects alleged above; by failing to maintain its supervising officer's weapon in operable condition; and by structuring a response in which, by its officers' own account, events outpaced any request for the City's crisis resources.

112. The City knew or reasonably should have known that these failures created a foreseeable and unreasonable risk that an encounter with a person in psychiatric crisis would escalate to unnecessary deadly force. That risk materialized on March 20, 2025.

113. The City's breaches were a direct, proximate, and substantial cause of Messiah's death and of the damages to Plaintiff as statutory beneficiary alleged in Count Six. The timeliness allegations of Part IV apply to this Count.

**COUNT EIGHT - SURVIVAL ACTION, A.R.S. § 14-3110**

**(By the Estate, Against All Defendants)**

114. Plaintiff incorporates all preceding paragraphs.

115. This Count asserts, on behalf of the Estate, the claims for negligence, battery, and related torts that belonged to Messiah at his death and that survive to the Estate under A.R.S. § 14-3110: Defendants' tortious conduct as alleged above injured Messiah between the moment of the shooting and his death, including the gunshot wounds themselves and the injury inflicted by the denial of timely medical care.

116. The Estate seeks all damages recoverable by law, including Messiah's medical expenses, funeral and burial expenses, lost earnings and earning capacity, and, on the federal claims and to the extent permitted by federal law, damages for Messiah's pre-death pain and suffering and the loss of his life.

117. The timeliness allegations of Part IV apply to this Count, including the suspension effected by A.R.S. § 14-3802, accrual upon the existence of a personal representative with capacity to act, and equitable tolling.

**VII. DAMAGES**

118. The Estate seeks compensatory damages for Messiah's pre-death conscious physical and emotional pain and suffering and for the loss of his life as components of its federal claims under 42 U.S.C. § 1983. To the extent A.R.S. § 14-3110 would bar those damages, its application to the Estate's § 1983 claims is inconsistent with 42 U.S.C. §§ 1983 and 1988(a) because the constitutional violations caused Messiah's death, and such damages are recoverable under the federal remedial rule recognized in *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014), and *Valenzuela v. City of Anaheim*, 6 F.4th 1098 (9th Cir. 2021).

119. The Estate further seeks economic damages including medical, funeral, and burial expenses and the loss of Messiah's earnings and earning capacity.

120. Plaintiff individually seeks compensatory damages for the deprivation of her familial relationship, and, on the state wrongful death counts, all damages recoverable

under A.R.S. § 12-613, including loss of companionship, love, care, guidance, and society, emotional distress, grief, and mental anguish.

121. Plaintiff and the Estate seek punitive damages against Defendants Gressley, Townsend, Meade, and Rowton, and the participating Doe Defendants in their individual capacities, whose conduct was reckless and callously indifferent to federally protected rights. No punitive damages are sought against the City.

122. Plaintiff seeks reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a. For compensatory damages in favor of the Estate, including damages for Messiah's pre-death pain and suffering and loss of life to the extent permitted by federal law, in an amount to be determined at trial;

b. For compensatory damages in favor of Plaintiff individually on her federal and state claims, in an amount to be determined at trial;

c. For all damages recoverable under Arizona's wrongful death statutes, A.R.S. §§ 12-611 through 12-613;

d. For punitive damages against the individual Defendants;

e. For reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a;

f. For pre-judgment and post-judgment interest as allowed by law; and

g. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

DATED this 5th day of October, 2026.

Respectfully submitted,

**LLG NATIONAL LAW GROUP**

By: /s/ Blake Wilkie
Blake Wilkie, Esq.
Phoenix Corporate Tower
3003 N. Central Avenue, Suite 685
Phoenix, AZ 85012
T: (602) 960-9400
E: Blake.wilkie12@gmail.com
Attorney for Plaintiff

**LLG NATIONAL LAW GROUP**



Robert S. Mactavish
Florida Bar Number 0596388
Phoenix Corporate Tower
3003 N. Central Avenue
Suite 685
Phoenix, AZ 85012
P: 575-517-6542

robert.mactavish@llgnational.com
Attorney for Plaintiff
*Pro Hac Vice*

**LLG NATIONAL LAW GROUP**

/s/ Nawal Ramay
Nawal Ramay, Esq.
NY State Bar No: 6317762
525 Route 73 North, Suite 104
Marlton, NJ 08053
T: (856) 652-2000
E: nawal.ramay@llgnational.com
Attorney for Plaintiff
[*Pro Hac Vice Application Pending*]